# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 23-1906V

| | |
|---|---|
| ROBERT HORNE,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: January 7, 2026 |

*Jimmy A. Zgheib, Zgheib Sayad, P.C.,* White Plains, NY, for Petitioner.

*Madylan Louise Yarc,* U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION AWARDING DAMAGES**[1]

On October 27, 2023, Robert Horne filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered from Guillain Barré syndrome ("GBS") due to an influenza ("flu") vaccine administered on October 26, 2022. Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties could not informally resolve damages.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$200,000.00, for actual pain and suffering, and $16,792.08 in past unreimbursable expenses, for a total of $216,792.08.**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.      **Relevant Procedural History**

Respondent filed a Rule 4(c) Report in August 2024 conceding that Petitioner was entitled to compensation in this matter. ECF No. 26. A Ruling on Entitlement was issued the next day. ECF No. 27. The parties thereafter attempted to informally resolve damages but were unsuccessful; they subsequently filed briefs setting forth their competing views. ECF Nos. 35-37. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF No. 40. The parties agreed, but prior to holding the hearing, Petitioner submitted updated medical records.[3] ECF Nos. 41-42. Respondent filed a motion to postpone the proceeding in light of Petitioner's recently-filed records.[4] ECF No. 43. Ultimately, the hearing was held as scheduled on December 19, 2025, during which I orally denied Respondent's motion to postpone.[5] Min. Entry, docketed Dec. 19, 2025. During the hearing, I also made an oral damages determination. This Decision memorializes those findings and determinations.

II.     **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are

---

[3] Petitioner submitted additional updated medical records on December 17, 2025, thus two days prior to the scheduled Motions Day proceeding. ECF No. 42. Such records encompass Petitioner's treatment (including physical therapy) from April 2025 – present. *See generally, id.* During the hearing held on December 19, 2025, Petitioner contended that such records support Petitioner's ongoing GBS sequelae, in that he still requires ongoing care and the use of assisted devices for mobility as a result of his vaccine-related injury.

[4] During the hearing, Respondent emphasized he had not had a chance to review these newly-filed updated records with his client and to determine what, if any, of Petitioner's current medical issues would be related to his prior GBS.

[5] At the end of the hearing held on December 19, 2025, I orally denied Respondent's motion to postpone the hearing (ECF No. 43) and noted that I do not routinely give much weight to evidence filed late in the duration of the case, especially when such evidence does not significantly change the nature of the parties' arguments. Also at the conclusion of the hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior GBS compensation within SPU. I fully adopt and hereby incorporate my prior discussions in Section II of *Congdon v. Sec'y of Health & Hum. Servs.*, No. 23-2025V, 2025 WL 2734068, at *2-3 (Fed. Cl. Spec. Mstr. Aug. 21, 2025).

### III. Appropriate Compensation in this Matter

#### A. Actual Pain and Suffering

In this case, awareness of the injury is not disputed. Petitioner was a competent adult with no impairments that would impact his consciousness of his injury. Therefore, I analyze principally the severity and duration of the injury. When performing this analysis, I review the record as a whole, including the medical records and affidavits filed, all assertions made by the parties in written documents, and the parties' arguments during

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

the expedited damages hearing.[7]

The evidence shows that prior to vaccination, Petitioner lived with his granddaughter and used a cane for ambulation, but was otherwise independent in performing all activities of daily living ("ADLs"). Ex. 4 at 187. His medical history is significant for shoulder pain, degenerative spine disease, and chronic back pain (following a work injury in 2016 causing some disability but "never weakness in his legs"). *Id.* at 701; Ex. 6 at 87.

Following his vaccination, Petitioner (age 72 when vaccinated) suffered a severe GBS illness resulting in *significant* weakness, debilitating functional and mobility impairments, and lengthy treatment at increasingly higher-level facilities. Specifically, his vaccine-related injury required presentation at the emergency room ("ER") within less than three weeks of vaccination due to lower extremity weakness and falls. He was transferred to a higher-level facility for a neurologic evaluation the very next day because of worsening weakness symptoms affecting his upper (and lower) extremities. Petitioner was diagnosed with GBS via lumbar puncture within six days of his hospital admission. His initial hospitalization lasted for eight days, during which time he underwent diagnostic or treatment procedures, including MRIs, one five-day course of IVIG, and IV Decadron, culminating in his discharge to a skilled rehabilitation facility.

At the time he was discharged to in-patient rehabilitation, Petitioner could not lift his legs or arms (0/5 strength), ambulate, or transfer without complete dependence on others. He remained at the skilled nursing facility for the next 13 days, during which time he received treatment with physical/occupational therapy ("PT/OT"), underwent a swallow study (revealing dysphagia[8] and achalasia), had speech therapy, and ate a modified diet of nectar-thick and thin liquids due to his difficulties swallowing.

Petitioner's in-patient rehabilitation was interrupted by a severe case of pneumonia (requiring medications, supplemental oxygen, and eventual transportation via EMS to the ER), ultimately leading to sepsis and acute respiratory failure, irregular heartrate, electrolyte imbalances, and deep vein thromboses ("DVTs") in each leg. During this hospitalization, Petitioner underwent additional diagnostic procedures including chest x-rays, CT scans, venous doppler scans, and an esophagogastroduodenoscopy, received

---

[7] I will note that the parties do not dispute many of the facts of Petitioner's initial post-vaccination injury course, especially concerning his first symptom presentation and acute phase. *Compare* Br. at 2-14, *with* Resp. at 2-11. However, the parties' main dispute centered around the *duration* of Petitioner's injury and what, if any, of his ongoing symptoms were attributable to his post-vaccination GBS.

[8] During Petitioner's December 8, 2022 esophagogastroduodenoscopy, the treater who performed the study noted that Petitioner had a three-year history of dysphagia prior to him developing GBS, but noted that Petitioner's current worsening of swallowing was related to his GBS. Ex. 9 at 649.

IV fluids and antibiotics, and other medications. As a result of these complications, Petitioner remained in the hospital and/or intensive care unit ("ICU") for 20 days before these acute conditions improved. Petitioner remained dependent for all ADLs even after these conditions resolved.

Petitioner returned to inpatient rehabilitation for an additional 27 days, where he completed aggressive PT/OT, ate a diet comprised of minced and moist foods with thin liquids, saw specialists (including cardiologist, urologist, physiatrist, nutritionist, and gastroenterologist), and underwent speech therapy. At the time of his discharge to outpatient PT/OT on January 19, 2023, though he was noted to be "feel[ing] better," Petitioner remained non-ambulatory (in a wheelchair) and dependent for *all* ADLs, including wheelchair propulsion. *See,* e.g., Ex. 10 at 172-73. Petitioner was thus hospitalized and/or in in-patient rehabilitation from November 12, 2022 – January 19, 2023 (or for a total of approximately 68 days).

Petitioner thereafter attended regular outpatient primary care provider ("PCP") visits throughout 2023 for treatment of residual effects of his GBS (i.e., weakness, pain, and paraplegia/paraparesis). In March 2023, Petitioner remained non-ambulatory (unable to propel his own wheelchair), and he thus requested an evaluation for a power mobility device, which was approved. Ex. 4 at 780. He began outpatient PT in October 2023 and continued through March 20, 2024 (approximately 26 sessions). At the conclusion of PT in March 2024, the treater noted that Petitioner had met his goal of a "full return to functional and self care [sic] activities." Ex. 15 at 5. Notably, Petitioner was noted to be ambulating with a cane (his baseline) by April 2024. Ex. 17 at 9.

Clearly, Petitioner's GBS was severe, requiring above-average levels of treatment. But despite Petitioner's contentions that he continues to be treated for his GBS-sequelae more than three years post vaccination (e.g., Br. at 16-21), I do not conclude on this record that the overall course of treatment Petitioner has required can entirely be attributed to his vaccine-caused GBS.

Thus, the record shows that by the time he saw a neurosurgeon and/or neurologist *(as early as February 8, 2024),* Petitioner's care was primarily focused on his low back pain that radiated to the lower extremities and neck pain radiating to the upper extremities that "began approximately 1 year ago with no inciting events or trauma." Ex. 12 at 57. By April 15, 2024, his neurology care was focused on his neck and bilateral lower extremity pain, assessed as radiculopathy of the lumbosacral/cervical regions (confirmed on a May 2024 EMG) or an "unspecified" inflammatory polyneuropathy. Ex. 17 at 6, 11-14. When Petitioner sought care with his treating neurologist in April 2024, the treater did not opine that such complaints were related to Petitioner's GBS. *See id.* at 8-10. More so, Petitioner's neurology treatment ceased in late November of 2024, and Petitioner only

5

returned to his neurologist on the day of the scheduled Motions Day proceeding. *See* Ex. 28 at 12-15. The existing record thus shows that Petitioner's vaccine-related injury had mostly resolved by spring 2024 (approximately 16 months post vaccination), and that his ongoing complaints thereafter (and through the present) were more likely associated with his comorbidities.

Indeed, Petitioner suffered from several pre-existing comorbidities, including degenerative spinal issues and back pain, requiring the use of a cane for ambulation pre vaccination. *See,* e.g., Ex. 4 at 187. Petitioner's post-vaccination clinical findings also confirmed cervical/lumbar radiculopathy by May 2024, for which he underwent additional treatment. *See,* e.g., Ex. 17 at 6 (May 6, 2024 EMG showing "unspecified" inflammatory polyneuropathy); Ex. 26 at 6-8 (September 3, 2024 PCP assessment including cervical radiculopathy, only, but "GBS" listed in active problem list). The presence of these comorbidities makes it extremely difficult to parse out Petitioner's ongoing GBS sequalae from his symptoms stemming from these other conditions – and that could have been exacerbated by his GBS. Thus, not all of Petitioner's residual effects can be attributable to his GBS over his pre-existing comorbidities.

In his briefings and during the damages hearing, Petitioner cites to a number of damages decisions involving GBS injuries and highlights the similarities between the petitioners in those cases and Petitioner. Br. at 16-19; Reply at 3-5.[9] Petitioner argues that an award of the statutory maximum of $250,000.00 is appropriate in this case. Br. at 15. Petitioner bases this request on his rapid onset of profound weakness, functional deficits (including an inability to ambulate and upper/lower extremity paralysis), a progression of symptoms to life-threatening complications requiring an extensive stay in the ICU, and long-term reliance on assisted devices (including a power mobility device) and others for ADLs as a result of his ongoing impairments. *See id.* at 16-17.

Respondent, on the other hand, argues that even though Petitioner received additional treatment for pneumonia and sepsis, he otherwise suffered a "moderate" course of GBS comparably speaking, due to the length of his GBS-related treatment and

---

[9] In particular, Petitioner cited to *Creely v. Sec'y of Health & Hum. Servs.,* No. 18-1434V, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2022) (awarding $250,000 for actual pain and suffering); *Hood v. Sec'y of Health & Hum. Servs.*, No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) (awarding $200,000 for actual pain and suffering); *Rastetter v. Sec'y of Health & Hum. Servs.,* No. 19-1840V, 2023 WL 5552317 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (awarding $195,000 for actual pain and suffering); *Hernandez v. Sec'y of Health & Hum. Servs.*, No. 21-1572V, 2023 WL 3317354 (Fed. Cl. Spec. Mstr. May 9, 2023) (awarding $192,000 for actual pain and suffering); *Fiumara v. Sec'y of Health & Hum. Servs.,* No. 23-138V, 2024 WL 4930694 (Fed. Cl. Spec. Mstr. Oct. 30, 2024) (awarding $197,500 for actual pain and suffering); *Miles v. Sec'y of Health & Hum. Servs.,* No. 20-146V, 2023 WL 21155 (Fed. Cl. Spec. Mstr. Jan. 3, 2023) (awarding $192,500 for actual pain and suffering); and *O'Donnell v. Sec'y of Health & Hum. Servs.,* No. 21-1508V, 2023 WL 9060699 (Fed. Cl. Spec. Mstr. Nov. 23, 2023) (awarding $190,000 for actual pain and suffering).

his significant comorbidities. Resp. at 12-13. He thus compares the facts of Petitioner's circumstances favorably to a number of less severe cases of GBS,[10] and proposes an award of only $130,000.00. *See id.* at 13-16.

The overall record supports the conclusion that Petitioner suffered an especially severe injury. I have also generally noted that GBS has a more frightening and inherently-severe character as a vaccine injury, in comparison to other Program claims – and as a result, higher-than-average pain and suffering awards are usually appropriate when GBS is the injury. *See Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021).

This is particularly true in this case. As noted above, Petitioner's GBS injury was severe and required intensive medical treatment, including an eight-day hospitalization, five-day course of IVIG treatment and numerous diagnostic procedures, a two-week stay in in-patient rehabilitation for PT/OT/speech therapy, a 20-day ICU stay with life-threatening complications, followed by a nearly one-month return to in-patient rehabilitation and a discharge to ongoing PT/OT care. Petitioner's injury required a modified diet, severely impacted his independence and ability to care for himself, and caused ambulatory issues, necessitating the use of assisted devices and a power mobility chair. Still, following his approximate 16-month course of treatment, and even accounting for some lingering deficits common to GBS's aftermath (weakness, numbness, pain – *that overlap with his symptoms stemming from his other comorbidities)*, Petitioner's condition caused by his GBS has somewhat returned to his baseline.

I find the comparable damages determinations offered by Petitioner to be helpful in providing a reasonable range of outcomes pertaining to the instant case. Nonetheless, Petitioner's circumstances do not warrant an award of the statutory maximum for pain and suffering that was awarded in the outlier case of *Creely,* which he relies upon for support.[11] The *Creely* petitioner was found to suffer GBS sequelae for over five years, without relief. No. 18-1434V, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2022). That petitioner's injury course was complicated by multiple falls, resulting in fractured ribs and the use of EMS services on several occasions. *Id.* The *Creely* petitioner was active and healthy prior to vaccination but never returned to his baseline. *Id.* He also experienced a

---

[10] Respondent cited to *Shankar v. Sec'y of Health & Hum. Servs.,* No. 19-1382V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) (awarding $135,000 for actual pain and suffering); *Weil v. Sec'y of Health & Hum. Servs.,* No. 21-831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Feb. 6, 2023) (awarding $140,000 for actual pain and suffering); *Turner v. Sec'y of Health & Hum. Servs.,* No. 19-1051V, 2021 WL 3834198 (Fed. Cl. Spec. Mstr. July 27, 2021) (awarding $150,000 for actual pain and suffering); and *Nelson v. Sec'y of Health & Hum. Servs.,* No. 17-1747V, 2021 WL 754856 (Fed. Cl. Spec. Mstr. Jan. 13, 2021) (awarding $155,000 for actual pain and suffering).

[11] I will also note that this case was decided by another special master, outside of the SPU, and not during an SPU Motions Day. I accordingly give this case slightly less weight in assessing damages in this situation.

*dramatic change in lifestyle* as a result of his vaccine-caused GBS. *Id.* Specifically, the *Creely* petitioner was forced to give up his long-owned pizza shop due to an inability to stand for long periods of time (among other things); he could no longer access the second floor of his home and accordingly slept in a hospital bed in the living room; he was bathed in the first floor half bath or kitchen sink by his wife for over four years; and he also used diapers. *See id.* As a result of these complications, that petitioner required the assistance of a life care planner to determine the extent of his future needs implicated by his injury. *Id.*

Comparatively, while Petitioner here experienced a severe injury made worse by life-threatening complications, he did not experience the same overall extent of long-term, *life-altering circumstances*. Petitioner's injury and ongoing deficits had a significant impact on his life (i.e., his granddaughter now has to cook meals for him, he relies on his cane more than he did pre-vaccination), and he has some long-lasting sequelae from his GBS, but these changes are not as extreme as in a case like *Creely*. The basis for awarding the statutory maximum in *Creely* arose from the specific facts presented therein. Petitioner is therefore entitled to a slightly lesser award than that awarded to the *Creely* petitioner.

At the same time, however, I do not find that an award of $130,000.00 (consistent with Respondent's proffered amount), is appropriate here. Out of all of Respondent's cited comparable cases (with a maximum award of $155,000.00 for actual pain and suffering), *none* of the petitioners in those cases experienced life-threatening complications (e.g., sepsis, aspiration pneumonia, DVTs, irregular heartrate and electrolytes, etc.) akin to what Petitioner experienced, and this evidence underscores the severity of his injury. And even though I have found that not all of Petitioner's ongoing sequelae are exclusively GBS-related, his ongoing sequelae are certainly somewhat uncommon and partially related to his injury.

For these reasons, the actual pain and suffering component in this case will be larger than in many other GBS cases. I therefore award actual pain and suffering in the amount of **$200,000.00.**

### B. Future Pain and Suffering

I do not include any component of damages for future pain and suffering. Such an award is appropriate "only for cases where a strong showing is made that the claimant has suffered a *permanent* disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). Special masters have previously declined to award a future pain and suffering award in the absence of

substantial indicia of permanency. *See,* e.g., *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925, at *17 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (noting there should be "adequate medical evidence demonstrating the likelihood that petitioner's [] injury, more likely than not, will extend well into the future and . . . indicating that [an] injury is permanent").

Although I credit Petitioner's assertions that he currently continues to experience ongoing sequelae, including weakness, balance issues, fatigue, and pain, thus requiring assistance with ADLs and the use of assisted devices (i.e., a cane, walker), I do not find sufficient evidence in the record supports the conclusion that Petitioner's GBS injury is *permanent* such that a future component is justified. While it is indeed relevant that Petitioner now relies on a cane more than he did pre-vaccination, for example, that is not *per se* evidence of a permanent injury - and he admittedly used a cane for years *before vaccination*.

Otherwise, to award a future pain and suffering component, I must have preponderant evidence that a petitioner's treatment directly related to GBS is ongoing, or that a treating neurologist has opined that the petitioner has symptoms that will never be resolved, or some specific permanent deficit. That is not the case here. Rather, Petitioner's neurology treatments tapered off around November 2024, and he only decided to return to a neurologist on the day of the damages hearing in this case. More so, Petitioner primarily continues to receive PCP and PT treatment for symptoms that likely reflect his significant comorbidities (e.g., Ex. 28 at 12-24 – treatment for an "unspecified" polyneuropathy and cervical radiculopathy throughout 2024; Ex. 31 at 4 – treatment with PT beginning in April 2025 to progress with strength, balance, and functional ability), instead of GBS specifically. The fact that Petitioner continues to treat his ongoing symptoms with PT is not in itself evidence of permanency or grounds for this component of damages (although I have considered it in calculating his actual pain and suffering award, since it evidences his current status). Petitioner is thus not entitled to an award of future pain and suffering.

### C. Unreimbursed Medical Expenses

Under the Vaccine Act, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . special equipment . . . determined to be reasonably necessary." Section 15(a)(1)(B).

In *Black v. Sec'y of Health & Hum. Servs.*, the Federal Circuit was faced with a question of whether "incurred," as used in the Vaccine Act, referred to "anticipated payments or obligations for which liability has not already attached" under a now-repealed portion of the Vaccine Act, 42 U.S.C. § 300aa-11(c)(1)(D). *See* 93 F.3d 781, 785 (Fed. Cir. 1996). The Federal Circuit defined "incur" as having its "ordinary" meaning, such that "to 'incur' expenses means to pay or become liable for them . . . . Thus, a person who is released from a hospital after treatment for a broken leg would normally be said to have 'incurred' the hospital expenses at that point . . . ." *Id.* at 785-86.

Moreover, the Vaccine Act does not allow petitioners to recover compensation "for any item of service to the extent that payment has been made . . . under any Federal or state health benefits program . . . ." Section 15(g). Accordingly, a petitioner may not receive compensation for any amounts that one can "reasonably expect" to be covered by Medicare or Medicaid, or those that should have been submitted to Medicare or Medicaid. *See id.*

In seeking $26,606.05 in past unreimbursed expenses, Petitioner acknowledges that "some expenses [sought] remain unpaid" but contends that "every claimed amount was incurred and remains owed by [Petitioner]." Br. at 22-23. Respondent does not appear to dispute that such expenses arose throughout Petitioner's treatment course, but contends that Petitioner has not submitted the requisite evidence of insurance payments, offsets, and adjustments to entitle him to each requested amount as a literal "unreimbursed expense." Resp. at 20 (citing Ex. A).

Although some of the requested expenses have not been shown to meet this standard, many have. For instance, the $3,753.00 charge disputed by Respondent contains a note that shows the bill had been submitted to insurance and the remaining amounts were listed as the "patient responsibility." Ex. A; Ex. 23 at 77-83. I will thus award this amount. Similarly, the $1,720.00 charge disputed by Respondent contains a note reading "we submitted a claim to your insurance plan . . ." and the remaining balance was owed by Petitioner. Ex. A; Ex. 23 at 5. I will also award this expense.

Other expenses disputed by Respondent (*see generally,* Ex. A) likewise contain sufficient documentation showing that such expenses were indeed incurred by Petitioner, were submitted to insurance, and remain Petitioner's responsibility. I will award those amounts in full, including $216.00 to Mbb Radiology (Ex. 23 at 2); $1,952.00 to Envision Physician Services (Ex. 23 at 13); $1,404.00 to Dr. Rolnick (Ex. 23 at 65-67); and $552.96 to National Medical Equipment (Ex. 23 at 29).

Regarding the $2,392.00 expense from "Neuroscience Consultants" disputed by Respondent, billing records show claim numbers for this care – seeming to correspond

to insurance claims submitted for this treatment. Ex. 23 at 25, 28. However, the amounts listed on the billing statements sent from this provider do not match the amount requested by Petitioner ($2,052.00 listed on the billing records (Ex. 23 at 25, 28), versus $2,392.00 requested by Petitioner, contained in other letters sent from the provider, without insurance claims listed (Ex. 23 at 24, 26)). I will award the amount affiliated with the billing statements with insurance claim numbers (Ex. 23 at 25, 28) - $2,052.00.

Finally, Petitioner requests $12,561.24 for reimbursement of 81 sessions of PT (from October 25, 2023 to October 14, 2024). Br. at 22. Respondent contends an appropriate reimbursement for this treatment is $0.00. Ex. A. The billing records for this treatment expensed show a specific amount before and after "insurance payments" for the PT sessions. Ex. 27 at 49. I will therefore award reimbursement of this expense. However, as I have already determined that only Petitioner's treatment through *early 2024* is likely connected to his GBS and thus compensable, I will reimburse Petitioner's PT treatment only through that time. The billing records contain Petitioner's balances for 36 sessions versus 81 PT sessions ($3,087.27 vs. $12,561.24). *See id.* I thus award Petitioner $3,087.27 for reimbursement of expenses for 36 PT sessions. Petitioner is therefore entitled to reimbursement of past unreimbursable medical expenses in the total amount of **$16,792.08.**[12]

## CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $216,792.08**, **(representing compensation for actual pain and suffering and past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Specifically, I award the following amounts requested by Petitioner: $120.00 + $27.45 + $1,556.00 + $3,753.00 + $1,720.00 + $48.66 + $2,052.00 + $107.11 + $216.00 + $80.19 + $1,952.00 + $115.44 + $1,404.00 + $552.96 + $3,087.27 = $16,792.08.

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.